UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
GARY LABABERA,THEODORE KING,LAWRENCE
KUDLA, THOMAS GESUALDI, PAUL GATTUS,
FRANK FINKEL, JOSEPH FERRARA, FRANK
DIMENNA and ROBERT CARLINO as Trustees
and Fiduciaries of the Local 282 Welfare
Trust Fund, the Local 282 Pension Trust
Fund, the Local 282 Annuity Trust Fund,
the Local 282 Job Vacation and Sick Leave          CV-06-1329
Fund and the Local 282 Job Training Fund,          (SLT)(JO)

                                        Plaintiffs,

              -against-

MMK TRUCKING, INC., RIO PAVING and ROAD
SAVERS, INC.,
                                        Defendants.
-------------------------------------X

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
GARY LABARBERA, LAWRENCE KUDLA, THOMAS
GESUALDI, PAUL GATTUS, THEODORE KING,
CHESTER BROMAN, FRANK FINKEL and JOSEPH
FERRARA, as Trustees and Fiduciaries of
The Local 282 Welfare Trust Fund, the
Local 282 Pension Trust Fund, the Local
282 Annuity Trust Fund, the Local 282
Job Vacation and Sick Leave Fund and               CV-03-1508
The Local 282 Job Training Fund,                   (SLT)(AKT)
                                        Plaintiffs,
              -against-

R. RIO TRUCKING a/k/a R. RIO TRUCKING,
INC., MMK TRUCKING, INC., RIO PAVING
and ROAD SAVERS, INC.,
                                        Defendants.
-------------------------------------X

## DEFENDANTS' JOINT POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## PRELIMINARY STATEMENT

The above captioned consolidated cases were brought by the Plaintiffs as Trustees and Fiduciaries of the Local Union 282 Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave benefit funds.  Both actions were brought in accordance with the Employee Retirement Income Security Act  of 1974("ERISA") against the Defendants.  Action #1 was brought against R. Rio Trucking, and unincorporated entity owned by Richard Rio; Rio Paving, an unincorporated entity owned by Frank Rio; Road Savers, Inc., an incorporated entity owned by Frank Rio; and MMK Trucking, Inc., an incorporated entity owned by William Evans and Jerome Ventura. R. Rio Trucking at one time was a signatory to the Local 282 collective bargaining agreement, while MMK at a different time was also signatory to a Local 282 collective bargaining agreement.  ("CBA") Action # 2 was maintained by the Plaintiffs against Road Savers, Inc. and MMK Trucking, Inc.

Both actions alleged, *inter alia*, that the Defendants operated jointly through the disguised forms of a "double breasting" operation; a successor operation; an alter ego enterprise; and/or a single and joint employer enterprise with each other to allegedly avoid paying fringe benefit contributions in accordance with the respective CBA signed by R. Rio Trucking and MMK  Trucking, Inc.

After the parties filed their respective Joint Pretrial Orders, with stipulated facts; proposed exhibits and proposed witnesses, this matter came on for trial before the Court commencing May 16, 2011, and continuing day to day thereafter.  In accordance with the direction of the Court upon the conclusion of trial, the parties were directed to serve and file their proposed Findings of Fact and Conclusions of Law with reference to both captioned actions.

1. **FINDINGS OF FACT**

    1.        Defendants, RIO PAVING ("RIO") and ROAD SAVERS, INC. ("ROADSAVERS"), by their attorneys, Dandeneau & Lott; Defendant MMK TRUCKING, INC. ("MMK"), by its attorneys, The Ziskin Law Firm, LLP; R. RIO TRUCKING, alleged as  a/k/a R. RIO TRUCKING, INC. ("RRT"), by its attorney, Lawrence Monat, Esq., as and for their Joint Post-Trial Proposed Findings of Fact and Conclusions of Law, with reference to both of the above captions actions, Action #1 and Action #2, respectfully state and show the following.

    2.        In this consolidated action, Plaintiffs, the Trustees of the Local 282 Trust Funds (the "Funds"), seek to obtain a judgment for fringe benefit contributions allegedly owed by the Defendants, plus the attendant damages, pursuant to provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, et seq.  **See Defendants' Trial Exhibit "F", 06-CV-1329 Proposed Second Amended Joint Pre-Trial Order, ECF # 36-2, Defendants' Trial Exhibit "E",  03-CV-1508 , Joint Pre-Trial Order, ECF # 44, Schedule B- Statement of Subject Matter Jurisdiction, Plaintiffs' Statement, p. 5**

    3.        The Funds' assert that this Court's subject matter jurisdiction is based on Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and that subject matter jurisdiction is invoked pursuant to Sections 502(a)(3), 502(g), and 515 of ERISA, 29 U.S.C. § 1132(a)(3), 1132(g), and 1145. **See Defendants' Trial Exhibit "F", 06-CV-1329 Proposed Second Amended Joint Pre-Trial Order, ECF # 36-2, Schedule B- Statement of Subject Matter Jurisdiction, Plaintiffs' Statement, p. 5; Defendants' Trial Exhibit "E", 03-CV-1508 Joint Pre-Trial Order, ECF # 44, Schedule B- Statement of Subject Matter Jurisdiction, Plaintiffs' Statement, p. 5.**

**ACTION #1**

**The "Single Employer," "Alter Ego," "Double Breasting" and "Successor" Allegations against R. Rio Trucking, Rio Paving and Road Savers in Action #1**

4.      The Funds allege that Defendant R. Rio Trucking. ("R. Rio Trucking") failed to pay employee benefit contributions pursuant to a series of CBA between Local 282 and R. Rio Trucking. **See Defendants' Trial Exhibit "A", Complaint Action# 1,03-1508, 6th and 7th Causes of Action.**

5.      The Funds further allege that, although Defendants Rio Paving and Road Savers were not signatories to the CBA, Road Savers and Rio Paving were bound by R. Rio Trucking's CBA and therefore liable to the Funds for unpaid contributions under the "single employer doctrine", the "alter ego" doctrine and/or the "successor doctrine." **See Defendants' Trial Exhibit "A", Complaint Action# 1, 03-1508, 6th and 7th Causes of Action.**

6.      The Funds also allege that Defendants violated the CBA provisions prohibiting the formation of a "double breasted operation." **See Defendants' Trial Exhibit "A",Complaint Action#1,  03-1508, 10th Cause of Action.**


**The Successorship Allegation against MMK and R. Rio Trucking**

7.      Finally, the Funds allege that MMK is the legal successor to R. Rio Trucking and that MMK and R. Rio Trucking are joint and severally liable to the Funds for Rio Paving and Road Savers' unpaid contributions under the "single employer doctrine", the "alter ego doctrine" and the "successor doctrine" **See Defendants' Trial Exhibit "A", Complaint Action #1, 03-1508, 8th Cause of Action.**

**ACTION #2**

**The "Single Employer," "Alter Ego," "Double Breasting" Allegations against MMK and Road Savers**

8.     The Funds allege in Action #2 that Defendant MMK Trucking, Inc. ("MMK") failed to pay employee benefit contributions pursuant to a series of collective bargaining agreements (hereinafter the "CBA") between Local 282, IBT (the "Union" or "Local 282") and MMK. **See Defendants' Trial Exhibit "F", 06-CV-1329 Proposed Second Amended Joint Pre-Trial Order, ECF # 36-2, Schedule C- Claims and Defenses, Plaintiffs' Statement of Liability, p. 6.**

9.     The Funds further allege that, although Defendant Road Savers, Inc. ("Road Savers") was not a signatory to the CBA, Road Savers is bound to the CBA between MMK and Local 282, and therefore is liable to the Funds for unpaid contributions under the "single employer doctrine" and/or the "alter ego" doctrine.  **See Defendants' Trial Exhibit "F", 06-CV-1329,  Proposed Second Amended Joint Pre-Trial Order, ECF # 36-2, Schedule C- Claims and Defenses, Plaintiffs' Statement of Liability, p. 6.**

10.     The Funds further allege that MMK violated the CBA's provisions prohibiting the formation of a "double breasted operation" with respect to Road Savers. **See Defendants" Trial Exhibit "C", Complaint # 06-1329, 5th Cause of Action.**

**Subject Matter Jurisdiction**

11.     Defendants submit that this Court lacks subject matter jurisdiction over the Funds' claims in both Action #1 and in Action #2 upon the grounds that as a matter of law, Defendants MMK, Road Savers, Rio Paving and R. Rio Trucking (collectively "the Defendants") do not constitute a single employer, joint employer, alter ego, double-breasted

operation and/or successor relationship so as to bind all of the Defendants collectively to the

subject collective bargaining agreements which would provide subject matter jurisdiction.

<u>Employee Retirement Income Security Act of 1974</u> ("ERISA"), as amended, 29 U.S.C. §§ 1001,

<u>et seq.</u>; Labor Management Relations Act of 1947, Section 301(a), 29 U.S.C. Section 185(a). **See**

**Defendants' Trial Exhibit "F", 06-CV-1329 Proposed Second Amended Joint Pre-Trial**

**Order, ECF # 36-2, Schedule B- Statement of Subject Matter Jurisdiction, Defendants'**

**Joint Statement, p. 5;  Defendants' Trial Exhibit "E", 03-CV-1508 Proposed Joint Pre-**

**Trial Order, ECF # 44, Schedule B- Statement of Subject Matter Jurisdiction, Defendants'**

**Joint Statement, p. 5.**


**Allegations of "Single Employer," "Alter Ego," "Double Breasting" in Action #1 and in**

**Action #2**

12.      These causes of action allege that the Defendants are single employers, alter egos,

successors and double breasted operations by virtue of "common control" are based on

allegations including common management and common business operations. **See Defendants'**

**Trial Exhibit "C", Complaint # 06-1329, ¶21-42; Defendants' Trial Exhibit "A", Complaint**

**# 03-1508, ¶36-61.**

**Allegation of "Joint Enterprise"**

13.      In  support of these theories, the Funds alleged in paragraphs 36 through 61 of the

Complaint in **Action #1** (03-CV-1508) that Defendants MMK, R. Rio Trucking, Road Savers

and Rio Paving are a joint enterprise based on a variety of factors. In part, it is alleged that

Defendants share common (1) management; (2) supervision; (3) working conditions; and (4)

customers. **See Defendants' Trial Exhibit "A", Complaint # 03-1508, ¶36-61.**

14.     In support of the Plaintiffs' theory in **Action #2**, the Funds alleged in ¶ 21 through ¶ 42 of the Complaint (06-CV-1329) that Defendants MMK and Road Savers are a joint enterprise based on a variety of factors. In part, it is alleged that MMK and Road Savers share common (1) management; (2) supervision; (3) working conditions; and (4) customers. There is no allegation of common ownership or familial connections.  **See Defendants' Trial Exhibit "C", Complaint # 06-1329, ¶21-42.**

15.     However, based upon the Trial evidence and the clearly Stipulated Facts between the Plaintiffs and the Defendants,  it is clear that the Defendants do not share an interrelation of operations, common management, centralized control of labor relations and common ownership with each other**. See Defendants' Trial Exhibit "F", 06-CV-1329 Proposed Second Amended Joint Pre-Trial Order, ECF # 36-2, Schedule F- Stipulated Facts and Law, ¶ 14-28, p. 12-13; Defendants' Trial Exhibit "E", 03-CV-1508 Proposed Joint Pre-Trial Order, ECF # 44, Schedule F- Stipulated Facts and Law, ¶ 11-14,18-19, 21-24, 120, 125, 126, 127, 133, 134, 136 and 137.** Additionally, there are no familial connections between the Defendants MMK and Rio and/or Road Savers.

16.     Based upon the clear Trial evidence and the Stipulated Facts, MMK and R. Rio Trucking do not share an interrelation of operations, common management, centralized control of labor relations and common ownership. **See Defendants' Trial Exhibit "E", 03-CV-1508 Proposed Joint Pre-Trial Order, ECF # 44, Schedule F- Stipulated Facts and Law, ¶ 18-19, 24, 36-37, 40, 114-116, 120-121, 125-130, 136-139, 179-180, 184-190, p. 15-17, 23-25, 29-30.** Additionally, there are no family connections between the two Defendants.

17.     Based upon the Parties' Stipulated Facts and Trial evidence, R. Rio Trucking does not share an interrelation of operations, common management, centralized control of labor

relations and common ownership with either Rio Paving or Road Savers. **See Defendants' Trial Exhibit "E", 03-CV-1508 Proposed Joint Pre-Trial Order, ECF # 44, Schedule F- Stipulated Facts and Law, ¶ 11-15, 21-23, 37, 40, 116-120, 138-139, 145, 174-180, 184-190.**

**Rio Paving and Road Savers as "Successors"/ "Single Employers"**

18.     Based upon the Parties' Stipulated Facts and Trial evidence, it appears that Rio Paving and Road Savers are successors and/or single employers. **See Defendants' Trial Exhibit "E", 03-CV-1508 Proposed Joint Pre-Trial Order, ECF # 44, Schedule F- Stipulated Facts and Law, ¶ 12-14,21-23,32-33, p. 15-16.** However, neither Road Savers nor Rio Paving were signatories to the LU 282 CBA.

19.     Therefore, with the exception of the Rio Paving/ Road Savers relationship set forth above, the causes of action which allege that Defendants are single employers, alter egos, successors and double breasted operations must fail.

**STATEMENT OF UNDISPUTED MATERIAL FACTS COMMON TO BOTH ACTIONS #1 AND #2**

**LOCAL 282 TRUST FUNDS- BACKGROUND**

20.     The Trustees are the fiduciaries of the Funds as defined by Section 3(21)(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Section 1002(21)(A). **See Defendants' Joint Local Civil Rule 56.1 Statement of Undisputed Material Facts (hereinafter "Defendants' 56.1") ¶ 1; Defendants' Trial Exhibit "C", CV-06-1329 Complaint, ¶ 5.; Defendants' Trial  Exhibit "A", CV-03-1508 Complaint, ¶ 7**. The Funds are "employee benefit plans" and "multiemployer plans' within the meaning of Section 3(3) and 3(37) of ERISA, 29 U.S.C. s. 1002(3) and 1002(37).

21.     The Funds are jointly administered by a Board of Trustees, comprised of an equal number of labor and management representatives in accordance with Section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. s.186(c)(5**). See Defendants' 56.1" ¶ 2; Defendants' Trial Exhibit "C", CV-06-1329  Complaint, ¶ 6;  Defendants' Trial Exhibit "A", CV-03-1508 Complaint, ¶ 5.**

## MMK BACKGROUND

22.     MMK is a New York corporation, which maintains its principal place of business at 58 Holbrook Street, N. Patchogue, New York 11772. Defendants' Trial Exhibit "E", Schedule F, ¶114; Ventura TT-564. Jerome Ventura's  ("Ventura") home address is 58 Holbrook Street, N. Patchogue, New York 11772. MMK is engaged in the business of providing trucking services to road construction contractors on Long Island **(Ventura TT-604)**, while Road Savers was engaged in asphalt repair work. **Ventura TT-472; 604; Rio TT-1258.**  MMK's truck yard is located at Hawkins Avenue, Ronkonkoma, New York. **Defendants' Trial Exhibit "E", Schedule F, ¶115; Ventura TT-564.**

## MMK OWNERSHIP

23.     At its inception in 2001, William Evans ("Evans") and Ventura were the only principles of MMK. **See Defendants' Trial Exhibit E, Schedule F, Schedule F, ¶19; Defendants' Trial Exhibit F, Schedule F, ¶19.** The term "MMK" refers to the first initial of the first name for each of Evan's children, Mary, Michael and Kelly**. Defendants' Trial Exhibit "E", '121".**

24.     When both Evans and Ventura owned MMK, Evans was in charge of labor matters dealing with Operating  Engineers Local Union 138, while Ventura was in charge of

labor maters with LU 282. **Defendants' Trial Exhibit "E",¶24**. In 2006, Jerome Ventura acquired the remaining shares of MMK because of Evan's health issues and his two and one half year fight with cancer, and has at all times thereafter been the sole owner of MMK. **Defendants' Trial Exhibit "F", ¶19, Evan TT-493,500.**

## MMK'S COLLECTIVE BARGAINING RELATIONSHIP WITH LOCAL 282

25.     Local 282 is a construction trucking union. MMK was a signatory to a collective bargaining agreement with Local 282. **Defendants' Trial Exhibit "F", Schedule F, ¶6**. On March 15, 2001, MMK became a signatory to the 1999-2002 Nassau/Suffolk Heavy Construction & Excavating and Asphalt Industry Contract with Local 282 thorough a Memorandum of Agreement. **Plaintiffs' Trial Exhibit "5**". Thereafter, MMK executed the Local 282 Nassau/Suffolk Heavy Construction & Excavating and Asphalt Industry Contract for the period 2002-2005 through another Memorandum of Agreement. **Plaintiffs' Trial Exhibit "6".**

26.     The Funds acknowledge that MMK signed a CBA with Local 282 in 2001. The Funds further acknowledge that the effective date of MMK's CBA is March 15, 2001. The Funds recognize that MMK has no obligation prior to the effective date of March 15, 2001.

27.     Ventura signed MMK's Memorandum of Agreement with Local 282.  Ventura has been a member of Local 282 since 2001. MMK signed a contract with Local 282 to allow Ventura to drive on "union jobs". **Defendants' Trial Exhibit "F", Schedule F, ¶29**.  The Union and the Funds recognized Ventura as the owner of MMK. **Pirozzi TT-135,138.**

## MMK'S COLLECTIVE BARGAINING RELATIONSHIP
## WITH NON-PARTY LOCAL 138

28.     In or about 2001, MMK became a signatory to a CBA with non-party Local 138,

International Union of Operating Engineers, AFL-CIO.  MMK's engineers operated sweepers and backhoes.

### MMK MANAGEMENT, SUPERVISION AND LABOR RELATIONS

29.      When MMK was incorporated, it operated out of the home of Ventura at 58 Holbrook Street, Ronkonkoma, New York . **Pirozzi TT-144; Ventura TT-564**.   Evans performed work under the Operating Engineers Local 138 labor agreement and Ventura is responsible for the trucking operations covered by the Local 282 CBA. **Defendants' Trial Exhibit "F", ¶26.**   Since MMK's inception, Ventura has been responsible for preparing the Local 282 remittance reports to the Local 282 Funds. **Defendants' Trial Exhibit "F", Schedule F, ¶20.**

30.      During his tenure as President of MMK, Evans was also responsible for signing the Local 282 remittance reports. **Defendants' Trial Exhibit "F", Schedule F, ¶21.**   Evans was also responsible for completing and signing the monthly Local 138 remittance reports in his capacity as President. While he was President of MMK, Evans was the only person with check-writing authority. **Defendants' Trial Exhibit "F", Schedule F, ¶22.**   Ventura is responsible for handling MMK's Local 282 issues, including contract negotiations and grievances. **Defendants' Trial Exhibit "E", Schedule F, ¶24.**   William Evans' was responsible for handling any issues arising from MMK's Local 138 CBA, including contract negotiations and grievances.

31.      Jerome Ventura is responsible for hiring drivers at MMK. Ventura TT-738. Jerome Ventura is responsible for preparing MMK's payroll**. Defendants MMK's Rule 56.1 Statement, ECF#17, ¶36, admitted Plaintiffs' Response, ECF#21, ¶36**.  Jerome Ventura is responsible for invoicing MMK's customers. Jerome Ventura is responsible for obtaining

MMK's customers and for maintaining customer relations. **Defendant MMK's Rule 56.1 Statement, ECF# 17, ¶38,40; Plaintiffs' admitted response, ECF#21, ¶36.**

32.     The MMK and Road Savers audits overlap for a period of 30 months (July 2003 through December 2005). During the overlapping period (July 2003 through December 2005), of the 28 employees employed by MMK, only 3 employees worked for Road Savers during that same period.

33.     Jones recognized at least 23 of the employee names on the MMK audit. The only 3 MMK employees that did appear on Road Savers audit between July 2003 and December 2005 were Jerome Ventura, Robert Ventura and William Hegarty III. According to Jones, Road Savers audit # 07-1052 listed forty-four (44) employees and only three (3) employees (Jerome Ventura, Robert Ventura and William Hegarty) worked for MMK Trucking during such period.

34.     Jones acknowledged that it is not uncommon to find a driver working for more than one employer and within a close period of time. Jones testified that an employee working for more than one employer during a given period of time is not enough evidence to determine that two companies are affiliates.

## LOCAL 282 STRIKES MMK IN 2002

35.     Anthony Pirozzi ("Pirozzi"), the Local 282 Business Agent for Suffolk County, admitted that he sought to have Jerome Ventura of MMK sign the Union's CBA in 2002. **Pirozzi TT-119.** Pirozzi acknowledged that in 2002 Jerome Ventura refused to accept the Union's appointment of Robert Rudge as the shop steward of MMK**. Pirozzi TT-118-119**. Pirozzi stated though that the Union put MMK on strike in September 2002 because MMK refused to sign the new Memorandum of Agreement**. Pirozzi TT-119, 132, 140.**

36.     Pirozzi admitted that he spoke with Jerome Ventura about signing the CBA when the Union struck MMK in 2002. **Pirozzi TT-119.**  Pirozzi stated that the Union struck and put up a picket line at MMK for one to two months in 2002. Pirozzi admitted that the Union's picket line against MMK was placed at Hawkins Avenue in Ronkonkoma, New York, which is the location of MMK's truck yard. **Pirozzi TT-119**. Pirozzi admitted that the picket signs stated "Local 282 On Strike MMK". Pirozzi testified that MMK's trucks were kept at the Hawkins Avenue address in Ronkonkoma.

37.     Pirozzi specifically admitted that Richard Rio, the brother of Frank Rio, was one of the MMK employee pickets on the MMK picket line. **Pirozzi TT-131**. Pirozzi testified that the strike ended after MMK ultimately signed the CBA. Pirozzi acknowledged that Jerome Ventura agreed to sign the CBA on behalf of MMK. Pirozzi specifically acknowledged that the Union's picketing of MMK was not directed at Road Savers or placed at Road Savers' business address at Union Avenue in Holtsville, New York.  **Pirozzi TT-145, 152**.

## MMK LEASES TRUCKS

38.     When MMK began its operations in 2001, it leased several trucks with a driver from Road Savers.  **Plaintiffs' Exhibit "E", Schedule F, ¶133. Ventura TT-721**. As Theresa Cody, the Fund's collection manager testified, this was not improper.  **Cody TT-1385-1386**. When MMK leased a truck with a driver from Road Savers, it paid Road Savers $550.00 per day. **Defendants' Exhibit "E", Schedule F, ¶56.**

39.     MMK has leased trucks from Road Savers, CT Trucking and others. MMK thereafter rented bare trucks (without drivers) from Road Savers and other truck rental companies, and hired drivers from Road Savers to work on the rented MMK trucks.  **Rio TT-1268.**

40.     Road Savers also leased trucks to other companies such as Asplundh Construction. **Rio TT-1258**.  Jerome Ventura is also the sole owner of FTU Leasing which owns six trucks, four ten wheelers and two tractor trailers.

41.     Ventura bought several of his trucks from Road Savers in 2005, as well as having bought them from Belli Nurseries and Suffolk Brake Company.  **Ventura TT-580**.  FTU  trucks are rented to MMK.

42.     MMK also rented trucks bare (without the driver) from FTU Leasing at the rate of $550 per day. The drivers of the bare trucks are supplied and paid by MMK.  FTU 's trucks are stored at Hawkins Avenue, Ronkonkoma, New York.

## RIO PAVING AND ROADSAVERS- BACKGROUND

43.     Frank Rio is the owner of Rio Paving. Frank Rio established Rio Paving in approximately 1983. He never incorporated the company. Rio Paving was an unincorporated business.

44.     Frank Rio established Road Savers in 1994, and incorporated it in the same year. Frank Rio is the owner of Road Savers.  **Defendants' "E", Schedule F, ¶14**. Road Savers is a New York corporation that maintains its principal place of business at 614 Union Avenue, Holtsville, New York 11742. **Defendants' "E", Schedule F, ¶6**.  Both Rio Paving and Road Savers were in the business of road recycling, asphalt recycling and paving. **Defendants' "E", Schedule F, ¶32.**

45.      Pirozzi acknowledged that Frank Rio is the owner of Road Savers. Pirozzi specifically acknowledged that Road Savers was located at Union Avenue in Holtsville, New York.

46.     The Funds admit that there is no one employed by the Plaintiff Funds that is

aware of the entity known as Rio Paving. The Funds admit that they are not familiar with an entity known as Rio Paving.

47.     The Funds admit that Rio Paving was never a signatory employer with Local 282. The Funds acknowledge that Rio Paving never submitted remittance reports or provided a surety bond to the Local 282 Funds. **Defendants' "E", Schedule F, ¶61.**

## RIO PAVING AND ROAD SAVERS MANAGEMENT, SUPERVISION AND LABOR RELATIONS

48.     Management of both Rio Paving and Road Savers is centralized in Frank Rio. Frank Rio is responsible for supervising and disciplining the employees of Rio Paving and Road Savers. **Defendants "E", Schedule F, ¶22**. Frank Rio is also responsible for the hiring of Rio Paving and Road Savers drivers.  **Defendants "E", Schedule F, ¶23.**

## MMK AND ROAD SAVERS DO NOT HAVE COMMON CUSTOMERS

49.     Asplundh Construction, a customer of Road Savers,  provides gas, electric and various construction services to KeySpan and other utilities. Asplundh also performs paving and concrete work. Asplundh contracts paving and concrete work to Road Savers. Asplundh subcontracts road restoration work, the repair of roadways after the roads have been opened to install gas mains to Road Savers. Asplundh subcontracts work to Road Savers and Road Savers invoices Asplundh for the work. Asplundh's contact person at Road Savers is Frank Rio. Asplundh does not do business with MMK**. Rio TT-1226; Defendants' "E", Schedule F, ¶158-163.**

50.     New York Paving was a customer of Road Savers. New York Paving was not a customer of MMK. Newborn is a customer of MMK. Newborn had hired R. Rio Trucking, Inc., which was incorporated by Frank Rio to maintain Newborn as a customer to perform work on a "patch master" machine and to perform milling and sweeping work.  **Ennesser TT-355**.

Newborn hired Road Savers to perform sweeping and milling work which is the work of Operating Engineers Local Union 138, not Local 282. **Ennesser TT-372-373**; Plaintiffs' Exhibit 59. MMK was also a customer of Newborn Construction, and performed trucking work, not operating engineer's work. **Ennesser TT-359,369.**

### JEROME VENTURA AND WILLIAM EVANS DO NOT OWN, DIRECT OR CONTROL ROAD SAVERS

51.    Jerome Ventura and William Evans do not have an ownership interest in Road Savers. Jerome Ventura and William Evans are not officers or directors of Road Savers. Jerome Ventura and William Evans are not responsible for Road Saver's hiring practices. Jerome Ventura and William Evans are not responsible for obtaining or billing customers for Road Savers. Jerome Ventura and William Evans do not sign the corporate tax returns for Road Savers, nor do they have check signing authority at Road Savers. **Defendants' "E", Schedule F,¶13, 14, 21, 22, 23; Defendants'"F", Schedule F, ¶24, 25, 36.**

### FRANK RIO DOES NOT OWN, DIRECT OR OTHERWISE CONTROL MMK

52.    Frank Rio does not own any shares of stock in MMK. Defendants' "E", Schedule F, ¶19. Frank Rio is not an officer or director of MMK. Frank Rio is not responsible for hiring drivers at MMK. **Defendants' "E", Schedule F, ¶24.** Frank Rio has no involvement in performing MMK's payroll or invoicing its customers. Frank Rio has no involvement in obtaining MMK's customers and nor does he have any involvement in such company's customer relations. **See Defendant MMK's Rule 56.1 Statement of Undisputed Facts, ¶¶ 22-33; 36, 37, ECF#17 and Plaintiffs' Admissions thereto, ECF#21.**

53.    Frank Rio did not sign MMK's NYS-45 tax filing form, but it was in fact signed by MMK's original accountant, Robert Bard, which was acknowledged by the Plaintiff's auditor, Ken Jones. **Jones TT-988-990; Plaintiffs' Exhibit 81, p. 3; Bard TT-1400.**

## THE LOCAL 282 TRUST FUNDS HAVE STIPULATED AND ADMITTED THAT ROADSAVERS IS NOT THE "NONUNION AFFILIATE" OF MMK

54.     The Funds have admitted in their responses to the Defendant MMK's "Statement of Undisputed Facts Pursuant to Local Rule 56.1" the following:

1.  Frank Rio is the owner of Road Savers.

2.  Jerome Ventura does not have an ownership interest in Road Savers.

3.  Jerome Ventura is not an officer of Road Savers.

4.  Jerome Ventura is not a Director of Road Savers.

5.  Jerome Ventura is not responsible for Road Saver's hiring practices.

6.  Jerome Ventura is not responsible for obtaining customers for Road Savers.

7.  Jerome Ventura is not responsible for billing customers of Road Savers.

8.  Frank Rio is not a shareholder of MMK.

9.  Frank Rio is not an officer of MMK.

10. Frank Rio is not a Director of MMK.

11. Jerome Ventura is responsible for  performing MMK's payroll

12. Frank Rio has no involvement in performing MMK's payroll.

**See MMK's Rule 56.1 Statement in 06-CV-1329, ECF#17 and Plaintiffs' Statement in Response, ECF#21, Statements 22, 23, 24, 25, 26, 27, 28, 31, 32, 33, 36 and 37.**

55.     Pirozzi admitted that Jerome Ventura is the owner of MMK. **Pirozzi TT-138**. The Funds have not produced any evidence to demonstrate that MMK and Road Savers share common management.

## ROBERT MACHADO, THE INVESTIGATIONS OFFICER ASSIGNED BY THE COURT TO INVESTIGATE LOCAL 282 FOR CORRUPTION, DID NOT PROVIDE EVIDENCE THAT MMK TRUCKING WAS AFFILATED WITH ROAD SAVERS

56.     Mr. Robert Machado is an Investigations Officer of Local 282 and had been appointed by Judge Platt from the Eastern District of New York. Machado has held such position for 12 years and was previously referred to as Corruptions Officer.  Mr.  Machado's appointment is derived from a Third Amended Consent Judgment. **Machado TT-416**. The Third Amended Consent Judgment empowers the Investigations Officer to investigate and take actions to eliminate the influence of corruption from Local 282. **Machado TT-417**. See Third Amended Consent Judgment.

57.     Under the consent decree, Machado has the power to recommend the removal or discipline union members, but Machado has not sought to have Jerome Ventura removed as a Local 282 member, and knows of no criminal charges of any nature being brought against anyone associated with Road Savers, MMK, R. Rio Trucking or R. Rio Trucking, Inc.  **Machado TT-438.**

58.     In fact, Mr. Machado testified that he had named Plaintiff Trustees Gary LaBarbera and Paul Gattus removed from Local Union 282 for engaging in a scheme to embezzle money from the Plaintiff trust funds.  **Machado TT-442-443.**

**KENNETH JONES, LOCAL 282 TRUST FUND AUDITOR ASSIGNED BY THE LOCAL 282 FUNDS TO AUDIT MMK AND ROAD SAVERS, DID NOT PROVIDE EVIDENCE THAT MMK WAS AFFILATED WITH ROAD SAVERS**

59.     Since March, 2006, Kenneth Jones ("Jones") has been employed as an auditor and as an audit supervisor at Wagner Zwerman, LLP.  Jones TT-920. As an auditor, Jones conducts audits of employer firms under contract with Local 282 and as a supervisor Jones audits the audits done by other auditors before they are delivered to the Local 282 Trust Funds. Jones TT-920.  Jones has been conducting audits for about 15 years. Jones has been previously employed

by the firm of DiPietto, Blum and Falzarano and the firm of Abrams, Herde and Merkel. At each of the auditing firms, Jones performed audits for the Local 282 Trust Funds or supervised such audits. Jones regular contact person at the Local 282 Funds is Theresa Cody ("Cody"). **Jones TT-924**. Cody provides Jones with a list of the employers that the Fund would like to have audited**. Jones TT-923**.

  60. Jones does not receive any directives, specific instructions and/or guidelines from the Funds in terms of performing the audits. **Jones TT-1028**. According to Jones, the Fund attorneys do not instruct him on how to perform audits.

  61. Jones was not involved in Plaintiffs' audit of MMK for the period March 15, 2001 to June 30, 2005, and as a result, did not have direct knowledge of what documents were in fact reviewed by the auditor. **Jones TT-986; Plaintiffs' Exhibit 81**.

  62. Mr. Jones was involved in Plaintiffs' audit of MMK for the period July 1, 2002 to December 31, 2005. **Plaintiffs' Exhibit 82**. He was also involved in Plaintiffs' audit of Road Savers, covering the period of June 27, 2003 to December 31, 2005. **Plaintiffs' Exhibit 83.**

  63. Mr. Jones testified that he assumed MMK and Road Savers were "affiliated" by virtue of an MMK 2001 NYS-45 tax reporting form purportedly signed by Frank Rio. **Plaintiffs' Exhibit 84; Jones TT-989.** This was despite the clear fact that the MMK accountant, Robert Bard sent a letter to Mr. Jones indicating that he had erroneously signed Mr. Rio's name to the MMK document**. See Plaintiffs' Exhibit 81, p. 3;  Jones TT-991.**

  64. With reference to the Plaintiffs' first MMK audit, Exhibit 81, the audit report indicated that there were no non-union trucks hires. **Plaintiffs' Exhibit 81, p. 4; Jones TT-992.** The Plaintiffs' auditor did not see any checks written for outside truck hires for the period March 15, 2001 through June 30, 2002. **Jones TT-993**. Additionally, the auditor did not review or

request to review MMK's General Ledger for the same period.  **Jones TT-993**. The auditor also concluded that MMK was not a member of any controlled group. **Plaintiffs' Exhibit 81, p.3**. Mr. Jones also gave an improper determination about the legality of outside truck hires when he testified that a Local Union 282 signatory could only hire other trucking companies that were also signatory to the Local 282 agreement.  **Jones TT-996.**

65.     The second MMK audit, which was conducted by Mr. Jones, also indicated that there were no out-side truck hires.  **Plaintiffs' Exhibit 82, p. 3**. Mr. Jones also testified that he could not determine from a company's payroll records whether the company's employees were performing work covered under the Local 282 agreement or not.  **Jones TT-997-998.**

66.     In conducting the second MMK audit, Mr. Jones reviewed payroll records, 941 tax forms, NYS 45 tax forms, W-2 and W-3 tax forms, and the corporation's federal 1120S tax returns.  He did not request cancelled checks or a General Ledger, and did not advise anyone at the Fund office or Plaintiffs' attorneys that these documents were not reviewed.  **Jones TT-999-1000.**

67.     Mr. Jones testified that he was looking to determine if there were any outside truck hires, yet did not seek to review cancelled checks or the General Ledger, which would have demonstrated the use of outside trucks.  **Jones TT-1006**. In fact, he had singularly focused on Road Savers's relationship to MMK when conducting his audit.  **Jones TT-1006.**

68.     Had Mr. Jones reviewed MMK's cancelled checks, he would have seen checks payable to CT Trucks/Consolidated Trucks and Blue Chip Trucking.  **Plaintiff's Exhibit 16, pp. 49, 267 and 191**.  Furthermore, MMK's 2003 federal tax return indicated outside equipment rentals in the amount of $120,000.00.  **Plaintiffs' Exhibit 25, p. 8.**

19

69.     With reference to the respective labor agreements that were sought to be introduced by the Plaintiffs, Mr. Jones acknowledged that the 1993-1996 Nassau-Suffolk Asphalt Agreement which was signed by Richard Rio under R. Rio Trucking, was no longer in existence. **Jones TT-1030; Plaintiffs' Exhibit 2**. Yet he significantly testified that he did not believe there was anything in Exhibit 2 that stated if a union trucking company hired outside, nonunion trucks, that the union company is charged with those hourly contributions for the nonunion company's employees. **Jones TT-1031**.

70.     Mr. Jones also testified that the outside truck hire provision contained in Plaintiffs' Exhibit 6, the 2002-2005 Nassau-Suffolk Memorandum of Agreement, was not the same provision in the underlying collective bargaining agreement as he knew it to be, even though he is provided with the underlying agreement that was not introduced into evidence by the Plaintiffs. **Jones TT-1053-1054; 1064-1065**.

71.     The MMK and Road Savers audits overlap for a period of 30 months (July 2003 through December 2005). During the overlapping period (July 2003 through December 2005), of the 28 employees employed by MMK, only 3 employees worked for Road Savers during that same period. **Plaintiffs' Exhibit 82 and 83**.

72.     Jones recognized at least 23 of the employee names on the MMK audit. The only 3 MMK employees that did appear on Road Savers audit between July 2003 and December 2005 were Jerome Ventura, Robert Ventura and William Hegarty III.

73.     According to the audit exhibits, Road Savers' payroll records listed forty-four (44) employees and only three (3) employees (Jerome Ventura, Robert Ventura and William Hegarty) worked for MMK Trucking during the overlapping period. **Plaintiffs' Exhibit 83.**

74.     The testimony of those subpoenaed drivers for the Defendants clearly indicates that it is not uncommon to find a driver working for more than one employer and within a close period of time.

75.     Mr. Jones conducted the audit of Road Savers for the period of June 27, 2003 through December 2005. A comparison of the audited payroll records of MMK and Road Savers for the same period of time demonstrated that twenty-one MMK employees were not on the Road Savers payroll.  These were Joseph Stanco, Robert Maloneri, Richard Faver, Joseph Sponellari, Richard Barstow, Ralph Wenzel, Anthony Miqueli, Luis Gonzalez, Ronald Schmitt, Keith Cartier, Karl Abramson, Carmine Jennaco, Emanual Tabone, Oscar Grenados, Dominick Jennaco, George Schmitt, Vincent Pagano, Joseph Carignan, Henry Ellison, Kenneth Nagy and Benny Genetempo.  Their hours were reported to the Funds, and any discrepancies were minor in nature, often resulting in an overpayment by MMK.  **Jones TT-1034-1052.**

76.     Jones testified that he was provided with the necessary payroll records for the MMK audit. In Jones' comments on the audit worksheets, he notes that MMK's books and records indicate no outside truck hire. **Plaintiffs Exhibit 82 p. 3.** Jones further noted that the MMK 1120S tax returns for the audit period reflect that William Evans and/or Jerome Ventura were the shareholders of MMK. **Exhibit 82, p. 3.**

77.     Jones also personally performed the audit for Road Savers for the period June 27, 2003 through December 31, 2005. Jones comments on the Road Savers audit set forth that Frank Rio is the 100 percent shareholder of Road Savers. **Plaintiffs' Exhibit 83, p. 3**.  Such information was taken from the corporation's 1120 or 1120S returns.

78.     During the Road Savers audit Jones did not come across any documents indicating that Jerome Ventura and/or Williams Evans were owners, directors and/or officers of Road Savers. **Plaintiffs' Exhibit 83, p. 3.**

### THE LOCAL 282 TRUST FUNDS DO NOT HAVE KNOWLEDGE AND/OR BELIEF THAT MMK IS THE SUCCESSOR TO R. RIO TRUCKING

79.     Significantly, Pirozzi specifically admitted that Richard Rio was one of the MMK employee pickets on the MMK picket line. **Pirozzi TT131-132**.  Pirozzi testified that Robert Rudge told him that Jerome Ventura was the owner of MMK.  **Pirozzi TT-138.**

80.     The Plaintiffs and Pirozzi admitted that they were not familiar with the ownership structure of R. Rio Trucking. **Defendants' Exhibit "E", Schedule F, ¶138-139;146-147**. The Plaintiffs admitted that the location of R. Rio Trucking's business was at 15 Elizabeth Way, Ridge, New York, and that Richard Rio was the owner. **Defendants' Exhibit "E", Schedule F, ¶145.**

### THE LOCAL 282 TRUST FUNDS DO NOT HAVE KNOWLEDGE AND/OR BELIEF THAT RIO PAVING IS THE "NONUNION AFFILIATE" OF MMK

81.     The Funds have failed to introduce any evidence suggesting that Jerome Ventura and/or William Evans are the owners of Rio Paving. Rio Paving stopped doing business in 1999, some two years before MMK was incorporated.

### THE LOCAL 282 TRUST FUNDS HAVE NO KNOWLEDGE AND/OR BELIEF THAT RIO PAVING AND/OR ROAD AVERS ARE THE "NONUNION AFFILIATES" OF MMK AND/OR R. RIO TRUCKING

82.     There is a plethora of admissions by the Plaintiffs that the named Defendants in Actions 1 and 2 do not have the requisite elements of any of the Plaintiffs' theories of liability.

The Funds admit that the Defendants' Rio Paving, Road Savers, MMK and/or R. Rio Trucking did not share common supervision.

83.     The Funds admit that they do not know whether the Defendants' Rio Paving, Road Savers, MMK and/or R. Rio Trucking shared common operations. The Funds admit that they do not know whether the Defendants' Rio Paving, Road Savers, MMK and/or R. Rio Trucking shared common customers.

84.     The Funds admit that they do not know whether the Defendants' Rio Paving, Road Savers, MMK and/or R. Rio Trucking shared equipment. The Funds admit that they do not know whether the Defendants' Rio Paving, Road Savers, MMK and/or R. Rio Trucking shared similar working conditions.

85.     The Funds admit that they do not know whether the Defendants' Rio Paving, Road Savers, MMK and/or R. Rio Trucking shared similar job classifications. The Funds admit that they do not know whether the Defendants' Rio Paving, Road Savers, MMK and/or R. Rio Trucking worked out of the same locations. **Defendants Exhibit "E", Schedule F, ¶¶19, 21, 22, 23, 24, 25, 32, 37, 40, 120, 125, 126, 127, 128, 129, 134, 136, 137, 145, 146, 147;  Defendants' Exhibit "F", Schedule F, ¶¶14, 19, 20, 21, 22, 24, 25, 26; Defendant MMK's Rule 56.1 Statement of Undisputed Facts, ECF#17, ¶¶5, 6, 8, 9, 13, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 36, 37;  Plaintiffs' Admissions to Defendant MMK's Rule 56.1 Statement of Undisputed Facts, ECF#21, ¶¶5, 6, 8, 9, 13, 21,22, 23,24, 25, 26, 27, 28, 29, 30, 32, 33, 36, 37.**

## WORK IN THE HEAVY CONSTRUCTION TRUCKING INDUSTRY IS TRANSIENT

86.     It is common for an employee to be reported to the Funds by more than one signatory company over a period of time. Since 2003, Theresa Cody was the Funds' point person for reviewing employee pay stubs in order to verify whether an employee's quarterly statement

from the Funds (listing hours reported on their behalf) are accurate.

87.    Cody's collection department pursues employers who do not report the hours and payments for hours worked by their employees under the CBA. Between the period May 2004 and July 2004, the quarterly statement of Emanuel Tabone reflects that he was employed by MMK, as well as signatory employers' J.D. Posillico, Royal Guard Fence, Safety Mark, Inc., Carlo Lizza & Sons, BRF Construction Corp. and Commodore Construction. Between the period May 2004 and July 2004, the quarterly statement of Ronald Schmitt reflects that he was employed by MMK, Horan Sand and Gravel and Bi-County Paving Corp. George Schmitt's 2004 annual report from the Funds reflects that he was employed by MMK, Bi-County Paving Corp., G & D Trucking and New York Paving. Between the period May 2004 and July 2004, the quarterly statement of Michael Stanco reflects that he was employed by MMK, J.D. Posillico, New York Paving and Hawkeye Construction. **See Defendants' Rule 56.1 Statement, ECF#17, ¶80 through 85, and Plaintiffs' Admitted responses, ECF# 21, ¶80 through 85.**

## A. <u>WILLIAM HEGARTY</u>

91.    William Hegarty III ("Hegarty") was employed a truck driver for Road Savers. **Hegarty TT-764**. While employed at Road Savers, Hegarty was issued a check signed by Frank Rio. **Hengarty TT-795**. While employed at Road Savers, Hegarty reported to 614 Union Avenue, Holtsville, and received his directions from William **Evans. Hegarty TT-771**.

92.    Hegarty began his employment with MMK as a truck driver in 2005. **Defendants' Exhibit "F", Schedule F, ¶44.** He went to work for MMK to earn more money**. Hegarty TT-778; 800**. Hegarty completed his MMK employment application at the home of Jerome Ventura. **Hegarty TT-796.**

93.    While employed at MMK, Hegarty reported to Hawkins Avenue, Ronkonkoma.

**Hegarty TT-797**. At MMK, Jerome Ventura was Hegarty's boss **(Hegarty TT-798)**, and Ventura sent Hegarty to Local Union 282 to join so he could drive trucks for MMK. **Hegarty TT-800-801.  See also:  Defendant MMK's Rule 56.1 Statement, ECF#17, ¶86 through 91, as admitted by Plaintiffs' Response, ECF#21, ¶86 through 91.**

## B. MICHAEL STANCO

94.   Since 2001, Michael Stanco has been a member of Local 282 Stanco was employed by MMK. Stanco is unfamiliar with Road Savers and with  Frank Rio. Stanco was never employed by Road savers, and never visited Road Savers' offices. **Defendant MMK's Rule 56.1 Statement, ¶94 through 99, ECF#17, as admitted by Plaintiffs' Responses, ECF#21, ¶94 through 99.**

## C. RONALD SCHMITT

95.   For approximately twenty years, Ronald Schmitt has been a member of Local 282. Ronald Schmitt was briefly employed by MMK. From working in the industry and meeting Jerome Ventura on jobs, Ronald Schmitt was aware that Ventura was an owner of MMK.

96.   While employed at MMK, MMK paid fringe benefit fund contributions on behalf of Ronald Schmitt to the Funds. Ronald Schmitt never received a check, cash or any compensation from Road Savers. Ronald Schmitt has never been employed by Road Savers. Ronald Schmitt has never heard of Road Savers. **Defendant MMK's Rule 56.1 Statement, ECF#17, ¶106 through 112, as admitted in Plaintiffs' Responses, ECF#21,¶106 through 112.**

## D. GEORGE SCHMITT

97.   For approximately fifteen years, George Schmitt has been a member of Local 282. When he was employed by MMK, he drove a truck that belonged to Blue Chip Trucking. **Schmitt TT-808**.  George Schmitt was employed as dump truck driver for MMK.

98.   While employed at MMK, MMK paid fringe benefit fund contributions on behalf of George Schmitt to the Funds. George Schmitt never received a check, cash or any compensation from Road Savers. George Schmitt has never heard of Road Savers.

99.   George Schmitt was aware that the owner of MMK was Jerome Ventura. George Schmitt has never heard of Frank Rio. While employed at MMK, George Schmitt reported to the 110 Sand Pit in Farmingdale, New York. **Defendant MMK's Rule 56.1 Statement, ECF#17, ¶121through 126, as admitted by Plaintiffs' responses, ECF#21, ¶121 through 126.**

## F. DENNIS CROWLEY

100.   Dennis Crowley was employed by Road Savers. At Road Savers, Crowley was hired by Frank Rio. While employed at Road Savers, Crowley received his job assignment from Steve Rio or Frank Rio, and his work consisted primarily of working on Road Savers' jobs for the Town of Brookhaven. **Crowley TT-876**.

101.   After his employment at Road Savers ended, Crowley became employed at MMK. **Crowley TT-879**. While employed at MMK, Crowley drove dump trucks and was hired by Jerome Ventura. While employed at MMK, Crowley reported to the Hawkins Avenue, Ronkonkoma yard. **Crowley TT-891**. All of MMK's trucks had the words "MMK Trucking" written on the trucks. While employed at MMK, Crowley received his work assignments from Jerome Ventura. While employed at MMK, Crowley received his paycheck at the Hawkins Avenue yard. While employed at MMK, Crowley picked up and dropped off his truck at the Hawkins Avenue yard.  **Defendant MMK's Rule 56.1 Statement, ECF#17, ¶121 through 126, as admitted by Plaintiffs' responses, ECF# 21, ¶121 through 126.**

102.   In 2002, Patrick McGroary was hired by Frank Rio to drive a truck for Road Savers. **McGroary TT-1081**. Frank Rio supervised Patrick McGroary during his employ with

Road Savers. **McGroary TT-1084**. Patrick McGroary was laid off from Road Savers and began

working exclusively for MMK.  **McGroary TT-1089-1090**.

103.   In 2002, Patrick McGroary was hired by Jerry Ventura to drive a truck exclusively

for MMK. **TT-1090**. He received a higher rate of pay when he worked for MMK.  **McGroary**

**TT-1093.** After being hired by MMK in 2002, Jerry Ventura requested that Patrick McGroary

obtain a union book from Local 282. **McGroary TT-1104; 1109**. Jerry Ventura supervised

Patrick McGroary at MMK.  He was supervised exclusively by Jerome Ventura. **McGroary TT-**

**1107.**

## THE RELATIONSHIP BETWEEN RICHARD RIO AND FRANK RIO AS IT APPLIED TO  R. RIO TRUCKING AND R. RIO TRUCKING, INC.

104.   Richard Rio is the younger brother of Frank Rio. Since 2002, Richard Rio has been

employed by the Town of Brookhaven Highway Department. Prior to 2002, Richard Rio was a

truck driver for JV Trucking and MMK. Prior to 2001, Richard Rio was a truck driver with J & J

Sand and Gravel for approximately four (4) years. From 1995 to 1998, Richard Rio was a truck

driver with R. Rio Trucking. Prior to that, he had worked for the Suffolk County Department of

Public Works for several years.

## R. RIO TRUCKING

105.   The Plaintiffs have admitted that R. Rio Trucking was an unincorporated business

which maintained its principal place of business at 15 Elizabeth Way, Ridge, New York.

**Defendants' "E", Schedule F, ¶116**. The Funds also admit that between 1995 and 1998,

Richard Rio operated R. Rio Trucking as a one truck business and leased its only truck from

Road Savers.  **Defendants' "E", Schedule F, ¶37.**

106.  R. Rio Trucking was a signatory to the Local 282 CBA for the period March 2,

1995 to June 30, 1996 and again from July 1, 1996 to June 30, 1999, and listed his address as 15

Elizabeth Way, Ridge New York. **Defendants "E", Schedule F, ¶36; 138; Plaintiffs' Exhibit "3".** The CBA expired June 30, 1999 after R. Rio Trucking stopped doing business in 1998, and the last positive remittance report filed by R. Rio Trucking was April, 1998**. Defendants "E", Schedule F, ¶182.**

107.    R. Rio Trucking had one (1) truck and never hired outside trucks. Richard Rio was the only employee.  **R. Rio TT-822**. The truck utilized by Richard Rio stated "R. Rio Trucking." **Defendants' Exhibit "E", Schedule F, ¶180**. Newborn Construction was the primary customer of R. Rio Trucking**. R Rio TT-822**. Richard Rio never drove for either Rio Paving or Road Savers.  **R Rio TT-824.**

108.    R. Rio Trucking filed its last positive remittance report with the Local 282 Trust Funds in April 1998. He stopped doing business in 1998.  R. Rio TT-852.  Even though he reported no hours for himself, the Union told him to continue to sign remittance reports and send them back, which he did until February, 2000**.  R Rio TT-828**.

109.    On February 2, 2000, a status request was made to the Local 282 Trust Funds to remove R. Rio Trucking from the active list. **Defendants "E", Schedule F, ¶183**.   The Local 282 Trust Fund records reflect that on October 3, 2000, Richard Rio requested that the Funds remove R. Rio Trucking from the active list. **Defendants "E", Schedule F, ¶184**.

110.    The Local 282 Trust Fund records reflect that on December 21, 2000, Richard Rio again requested that the Funds remove R. Rio Trucking from the active list and that his company no longer wanted an agreement with Local 282. **Defendants' Exhibit "E", Schedule F, ¶185**. The Local 282 Trust Fund records reflect that on January 29, 2001, Richard Rio once again requested that the Funds remove R. Rio Trucking from the active list. **Defendants Exhibit "E", Schedule F, ¶186.**

111.    The Local 282 Trust Fund records reflect that on January 29, 2001, Richard Rio refused the Funds request to obtain a surety bond because R. Rio Trucking did not sign the 1999-2002 CBA. **Defendants Exhibit "E", Schedule F, ¶187.**

112.    In February 2001, Richard Rio again requested that the Funds remove R. Rio Trucking from the active list and in June 2001, R. Rio Trucking advised the Funds that the company had been inactive since May 1998. **Defendants' Exhibit "E", Schedule F, ¶188 and 189.** On January 22, 2002, the Local 282 Trust Funds inactivated R. Rio Trucking. **Defendants' Exhibit "E", Schedule F, ¶190.**

113.    Richard Rio testified that after he discontinued R. Rio Trucking in 1998, he went to work for J & J Sand and Gravel, until they no longer had work for him. **R. Rio TT-852-853; 855.** Even though R. Rio Trucking was not incorporated, he testified that he called everything a corporation, regardless of the type of legal entity it was**. R. Rio TT-840**. He did not know how the entity "R. Rio Trucking, Inc." became incorporated. **R. Rio TT-840-841; 859.**

114.    Ultimately Frank Rio formed R. Rio Trucking, Inc. in order to maintain a relationship with Newborn Construction, to whom his brother had introduced him. **F. Rio TT-1148**. Frank Rio  also incorporated R. Rio Trucking, Inc. to enable himself to keep track of the loan repayments that his brother Richard owed to him, in as much as Richard would get credited with a percentage of the revenues generated by R. Rio Trucking, Inc. from Newborn Construction. **F. Rio TT-1148**. Richard did not know at the time that his brother incorporated R. Rio Trucking that he had in fact done so. **R. Rio TT-842-843; 850.**

115.    Frank Rio had loaned his younger brother considerable amounts of money over the years for both personal and business reasons. **F. Rio TT-1239; R. Rio TT-844**. Richard Rio

received a percentage of that income to repay his debts to his brother. **F.  Rio TT-1242; R. Rio TT-844; 846.**

116.   Frank Rio used R. Rio Trucking, Inc. to perform work for Newborn Construction that was not covered by the Local 282 agreement.  This work was in the nature of milling work, sweeping and the asphalt patching of roads. **Ennesser TT- 355; 372-373**.  This work was ultimately taken over by Road Savers in 2002. **Plaintiffs' Exhibits 59 and 60**.  Road Savers never performed trucking work for Newborn Construction.  Ennesser TT-377.

### CHART OF DEFENDANTS' BUSINESS OPERATIONS

| Defendant | Ownership | Management | Labor Relations/ Supervision | Business Purpose |
|-----------|-----------|------------|------------------------------|------------------|
| **MMK Trucking** | William Evans & Jerome Ventura | William Evans & Jerome Ventura | William Evans & Jerome Ventura | Provides trucking services to road construction contractors on Long Island |
| **Road Savers** | Frank Rio | Frank Rio | Frank Rio | Road recycling & asphalt recycling & paving |
| **Rio Paving** | Frank Rio | Frank Rio | Frank Rio | Road recycling& asphalt recycling & paving |
| **R. Rio Trucking** | Richard Rio | Richard Rio | Richard Rio | Provided trucking services to road construction contractors on Long Island |

| Defendant | Years of Incorpor-ation/ Operation | Signatory to Local 282 CBA | Equipment Yard | Customers |
|---|---|---|---|---|
| **MMK Trucking** | 2001 to present | March 15, 2001 to present | Hawkins Avenue, Ronkonkoma, NY | Newborn |
| **Road Savers** | 1994 to present | No | 614 Union Avenue, Holtsville, NY | Asplundh, New York Paving |
| **Rio Paving** | 1983-1999 | No | 614 Union Avenue, Holtsville, NY | Asplundh, New York Paving |
| **R. Rio Trucking** | 1995-1998 | March 2, 1995 to June 30, 1999 | 15 Elizabeth Way, Ridge, New York | Newborn |

## THE DISCREPENCY BETWEEN THE AUDITS PERFORMED BY THE PLAINTIFFS AND THE LABOR AGREEMENTS SOUGHT TO BE APPLIED BY THE PLAINTIFFS

117.   The Plaintiffs presented testimony from two auditors, Mr. Ken Jones and Mr. Richard Bamberg.  Their testimony revolved around the terms and conditions of the respective Local Union 282 labor agreements, and the obligation to remit hourly benefit contributions from contributing employers.

118.   In order to do so, the auditors testified that they applied hourly benefit rates derived from the respective labor agreements, and multiplied those hourly rates by the number of hours for employees of the named Defendants for whom the Plaintiffs are claiming contributions are due.

119.    As indicated during the course of the trial and after the parties had rested, the only respective agreements that were introduced in evidence were the Memorandum of Agreement

("MOA") for R. Rio Trucking, for the years 1996 through 1999 ("Plaintiffs' Exhibit 3"); the

MOA for MMK for the years July 1, 1996 through June 30, 1999 ("Plaintiffs' Exhibit 4"); the

MOA for MMK for the years July 1, 1999 through June 30, 2002 ("Plaintiffs' Exhibit 5"); the

MOA for MMK for the years July 1, 2002 through June 30, 2005 ("Plaintiffs' Exhibit 6"); and

the MOA for MMK for the years July 1, 2005 through June 30, 2008 ("Plaintiffs Exhibit 7").

120.    Plaintiffs Exhibit 81 is the audit of MMK by Ken Jones for the period from March

15, 2001 through June 30, 2002.  As a result, the corresponding MOA would be Plaintiffs'

Exhibit 5 and 6.  Between July 1, 2000 and July 1, 2001, the Welfare contribution rate was raised

a total of $0.60. **See Plaintiffs' Exhibit 5, p. 1**.  Between July 1, 2001 and June 30, 2005, the

MOA stated that the total "wage and benefit package" would increase $1.50 each of the three

years of the MOA. **See Plaintiffs' Exhibit 6, p. 1 ¶3.**

121.    The Ken Jones MMK audit for the period of March 15, 2001 and June 30, 2002

(Plaintiffs' Exhibit 81), reflected calculations for welfare contributions that went from $6.90 per

hour to $7.50  per hour ($0.60 increase) and  pension contributions that increased from $4.00 per

hour to $4.65 per hour ($0.65 increase).  This was a total increase of $1.25 per hour, leaving

$0.25 for an hourly wage increase.  This is clearly not what the auditors relied upon in producing

this audit, and as a result, Plaintiffs' Exhibit 81 is clearly erroneous.

122.    The Ken Jones MMK audit for the period July 1, 2002 through December 1, 2005

(Plaintiffs' Exhibit 82), reflects for the three year period of the audit, a welfare contribution

increase in the amount of $0.90 per hour; a pension contribution increase for the same period in

the amount of $1.85 per hour; an annuity contribution increase for the same period in the amount

of  $1.45 per hour; and a job training fund increase for the same period of $0.05.  **See Plaintiffs'**

**Exhibit 82, p. 1-2.**

123.   The total benefit contribution increases for the period of this audit was $4.25 per hour, while the MOA for the same period called for a total wage and benefit increase of $1.50 per hour each year of the MOA.

124.   Reviewing Plaintiffs' Exhibit 82, for the period of July 1, 2002 to June 30, 2003, the welfare fund contribution increase was $0.45 per hour; the pension fund contribution increase was $0.85 per hour; and the annuity fund contribution increase was $0.50 per hour. The total fund contribution increases for this one year period was $1.80 per hour, which exceeded the MOA stated combined increase for wages and benefits by $0.30 per hour.

125.   Clearly, the audit results do not comport with the MOA, leading to the conclusion that the MOA's in evidence were not the true agreements that the Plaintiffs are seeking to apply against the Defendants.

126.   The Ken Jones audit of  Road Savers for the period from June 27, 2003 through December 31, 2005, also reveal the same glaring errors. **See Plaintiffs' Exhibit** 83. In fact, for the one year period from July 1, 2003 through June 30, 2004, the total welfare, pension, annuity and job training fund contributions all rose by a combined total of $1.50 per hour.  This left the inconceivable amount of $0.00 for any wage increases during that period of time.

127.   Richard Bamberg testified that he performed the Rio Paving (as a non-signatory affiliate of R. Rio Trucking) audit for the period of July 1, 1996 through December 31, 1998. **Plaintiffs' Exhibit 90**.  The corresponding MOA was Plaintiffs' Exhibit 4. For the period from July 1, 1996 to June 30, 1997, the welfare contribution rate stayed at $7.61 per hour.  It increased $0.24 per hour from July 1, 1997 to June 30, 1998. There were no other stated benefit contribution increases stated in Plaintiffs' Exhibit 3. **See Plaintiffs' Exhibit 4, p. 2.**

128.   Mr. Bamberg's audit for the corresponding period shows the stated welfare fund

increase of $0. 24 per hour, yet also shows an annuity fund increase of $0.25 per hour for the same stated period.  This annuity fund increase is not stated anywhere if Plaintiffs' Exhibit 4, which again was the only agreement placed into evidence by the Plaintiffs for this period.

129.   On cross-examination, Mr. Bamberg testified that he used a different labor agreement for the period prior to July, 1996, which he admitted was a different contractual document  than the one listed on page one of his audit report.  **Bamberg TT-1365.** Mr. Bamberg further admitted that his audit report erroneously included the unspecified annuity fund increase of  $0.25, which was not part of the applicable MOA.  **Bamberg TT-1368.**

130.   Plaintiffs' audit of Road Savers for the period from December 31, 1998 through June 25, 2003, was also performed by Mr. Bamberg.  Plaintiffs' Exhibit 5 was the corresponding MOA for the first two years of the audit period.  The MOA reflected that there was only to be an increase in the welfare contribution of $0.60 total for the MOA contract period of July 1, 1999 through June 30, 2002.  **Plaintiffs' Exhibit 5, p. 1**.

131.   Yet Mr. Bamberg's audit report for the period January 1999 through June 2002, indicates a pension fund contribution increase of $1.55 per hour; an annuity fund increase of $0.25; a job training fund increase of $0.05 per hour; and a vacation fund increase of $0.30 per hour.  **See Plaintiffs' Exhibit 88, p. 2-3**.

132.   For the third year of the audit period, to wit, July 1, 2002 to June 30, 2003, Plaintiffs' Exhibit 6 covered this period.  As already demonstrated, Plaintiffs' Exhibit 6 only called for a wage and benefit increase of $1.50 for each of the three years of the contract, yet Mr. Bamberg's audit showed a $0.45 per hour increase in welfare contributions; a $0.50 per hour increase in pension fund contributions; a $0.50 per hour increase in annuity fund contributions; a $0.05 per hour increase in job training fund contributions; and a $0.30 per hour increase in

vacation fund contributions. None of these contribution increases were also contained in the applicable MOA.

133.   Mr. Bamberg again admitted that based upon the applicable MOAs, (Plaintiffs' Exhibit 5 and 6),  there should have been no increases for the annuity fund, the pension fund, the job training fund or for the vacation fund, and as a result, the subject MOAs were clearly inapplicable to the audit.  **Bamberg TT-1370-1374.**

134.   Further in his cross-examination, Mr. Bamberg could not testify if the subcontracting language  for outside truck hires was the same in any of the subject industry agreements  **Bamberg TT-1376.**

135.   The irrefutable conclusion to be drawn from these four (4) audits is that the introduced MOAs were not the operative agreements required in order to assess any liability to the Defendants, and the "best evidence rule" requirements should be upheld.

**<u>DEPOSITION TESTIMONY OF JOSEPH GRILLO</u>**

136.   Joseph Grillo failed to appear in accordance with a subpoena served upon him, which resulted in the Court authorizing the utilization of his two (2) depositions, dated October 24, 2004, and May 30, 2007, respectively.  The October 24, 2004, deposition was given in conjunction with Action #1, while the May 20, 2007 deposition was given in conjunction with Action # 2.  The respective transcripts were identified as Plaintiffs' deposition transcripts Tab #12 and Tab #13.

137.   Mr. Grillo was the accountant for Rio Paving, Road Savers, Inc. and MMK Trucking, Inc.  Mr. Grillo testified that he was retained by the named Defendants at different times. **Tab # 12, pp. 7-8**. When he performed accounting work for R. Rio Trucking, Inc. and Road Savers, he was retained by Frank Rio for R. Rio Trucking, Inc., Road Savers and Rio

Paving. **Tab #12, pp. 13, 15 and 16**. He was retained by MMK in 2003, and was retained by

William Evans, who also supplied him with the necessary information to perform his tax and

accounting work for MMK. Tab #12, pp. 17 and 18; Tab #12, p. 7. With reference to MMK's

tax returns, Mr. Grillo indicated that in the year 2002, MMK was depreciating a single vehicle

valued at $24,351.00. **Tab #12, p. 54-55; Tab # 13, p. 9.**

138.   Mr. Grillo further testified at his first deposition that the business activity of Rio

Paving was asphalt paving and consulting, and that Rio Paving had no employees. **Tab #12, pp.**

**67; 71; 73**. The MMK tax return for 2003 indicated that MMK was engaged in the sale of

trucking services. **Tab #13, p. 7**. The 2003 corporate MMK tax return also indicated that in

2003, MMK had equipment rentals in the amount of $120,000.00, and a payroll of $278,114.

**Tab #13, pp. 15-16**. In 2004, MMK purchased a truck for $30,000.00, and had equipment rentals

of $77,740.00. **Tab #13, pp. 18-19**.

139.   In 2005, Mr. Grillo indicated that Road Savers sold to FTU Leasing Corp. five (5)

trucks for the price of $275,00.00. **Tab #13, pp. 53; 55; 60**. Significantly, none of the sale

documents that were shown to Mr. Grillo at his deposition and identified by him were introduced

at trial by the Plaintiffs as proof of the arms length sale of equipment from Road Savers to

MMK.

## PROPOSED CONCLUSIONS OF LAW

## ARGUMENT

### A. Theories of Liability to Recover Contributions from Non-Signatories to CBA

#### 1. The Alter-Ego Claim

140.   "The focus of the alter ego doctrine ... is on the existence of a disguised

continuance or an [employer's] attempt to avoid the obligations of a collective bargaining

agreement through a sham transaction or technical change in operations." <u>Newspaper Guild of</u>

<u>New York, Local No. 3 of Newspaper Guild, AFL-CIO v. N.L.R.B.</u>, 261 F.3d 291, 298-299, 167

L.R.R.M. (BNA) 2808, 144 Lab.Cas. P 11,066 (C.A.2, 2001) quoting <u>Lihli Fashions Corp. v.</u>

<u>NLRB</u>, 80 F.3d 743, 748 (2d Cir.1996) (internal quotation marks and citation omitted). An

employer found to be the alter ego of another is automatically responsible for the other's legal

and contractual obligations under the labor laws. See id at 298-299.

    141.    The Court's inquiry on alter ego status "focuses on commonality of (i)

management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi)

supervision and ownership." <u>New York State Teamsters Conference Pension and Retirement</u>

<u>Fund v. Express Services, Inc., 426 F.3d 640</u>, 649-650, 35 Employee Benefits Cas. 2569, Pens.

Plan Guide (CCH) P 29994L (C.A.2, 2005)**;** <u>Newspaper Guild of N.Y. v. NLRB</u>, 261 F.3d 291,

294 (2d Cir.2001); and  <u>Local One Amalgamated Lithographers of Am. v. Stearns & Beale, Inc.</u>,

812 F.2d 763, 772 (2d Cir.1987). Also considered is evidence of anti-union motive. <u>Newspaper</u>

<u>Guild of New York, Local No. 3 of Newspaper Guild, AFL-CIO v. N.L.R.B.</u>, 261 F.3d at 299.

    142.    The alter ego doctrine " 'is designed to defeat attempts to avoid a company's union

obligations . . . .' " <u>Brown v. Dominic Prisco Transport, Inc., No. CV 95-1121, 1997 WL</u>

<u>1093463, at *4 (E.D.N.Y. Aug. 16, 1997)</u> <u>See Ziskin Dec., Exhibit "ZZ".</u> (quoting <u>Local One,</u>

<u>Amalgamated Lithographers v. Stearns & Beale, Inc., 812 F.2d 763, 772, 124 LRRM 2809 (2d</u>

<u>Cir. 1987)</u>. Although the factors used to determine alter ego liability are similar to those relevant

to the determination of single employer status, the main difference between the two doctrines is

that the alter ego doctrine focuses on "the existence of a disguised continuance or an attempt to

avoid the obligations of a collective bargaining agreement through a sham transaction or

technical change in operations." <u>Lihli Fashions Corp.</u>, 80 F.3d at 748 (citing <u>Truck Drivers Local</u>

Union No. 807 v. Regional Import & Export Trucking Co., 944 F.2d 1037, 138 LRRM 2486 (2d

Cir. 1991) (quoting Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., 690 F.2d 489,

111 LRRM 2787; 112 LRRM 2525 (5th Cir. 1982), cert denied 464 U.S. 932, 104 S.Ct. 335, 78

L.Ed.2d 305 114 LRRM 2976 (1983).

143.   In addition, the alter ego doctrine usually applies when a new legal entity has

replaced a unionized predecessor, whereas the single employer doctrine generally applies where

the entities concurrently perform the same function and only one entity is a union employer.

Newspaper Guild of New York, 261 F.3d at 303 (affirming finding that single employer doctrine

was inapplicable where the entities were not operated concurrently). See also A&P Brush Mfg.

Corp. v. NLRB, 140 F.3d 216, 219-221 157 LRRM 2980 (2d Cir. 1998) (applying alter ego

doctrine where entities were not concurrently operated); Goodman Piping Products, Inc. v.

NLRB, 741 F.2d 10, 11, 117 LRRM 2143 (2d Cir. 1984) (per curiam) (same); LaBarbara v. C.

Volante Corp., 164 F.Supp.2d at 326-27 (holding that the single employer doctrine did not apply

where the signatory company ceased operations before the non-signatory company was created).

"An employer found to be the alter ego of another is automatically responsible for the other's

legal and contractual obligations under the labor laws."

144.   Here, MMK and Road Savers meet none of the requirements for a finding that they

are operating as alter ego companies. MMK and Road Savers have established that they do not

have the same management, operations, business purpose, supervision, ownership, equipment

yards and/or customers.  The Funds have failed to submit any evidence to the contrary.

Significantly, MMK was not the union predecessor as Road Savers was operating as early

as1994. Most importantly, however, is the fact that the companies are being operated

concurrently. In such circumstances, the Second Circuit has held that the single employer

doctrine should be applied in place of the alter ego doctrine. <u>Newspaper Guild of New York</u>, 261 F.3d at 303. Accordingly, the alter ego doctrine is inapplicable to the facts of this case and the Funds' alter ego claim must be dismissed.

145.   Likewise, R. Rio Trucking does not meet any of the requirements for a finding that it operated as alter ego of Road Savers and/or Rio Paving. As discussed above, the stipulated facts establish that R. Rio Trucking and Road Savers/Rio Paving do not have the same management, operations, business purpose, supervision, ownership, equipment yards and/or customers.  The Funds have failed to submit any evidence to the contrary. Most importantly, however, is the fact that the companies operated concurrently. In such circumstances, the Second Circuit has held that the single employer doctrine should be applied in place of the alter ego doctrine. <u>Newspaper Guild of New York</u>, 261 F.3d at 303. Accordingly, the alter ego doctrine is inapplicable to the facts of this case and the Funds' alter ego claim must be dismissed.

## 2.  **The Single Employer Claim**

146.   The Funds acknowledge that Road Savers was not a signatory to a CBA, but argue that Road Savers should be held liable under the CBA pursuant to the single employer doctrine. The single employer doctrine applies when " 'separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise.' " <u>Clinton's Ditch Coop. Co., Inc. v. NLRB</u>, 778 F.2d 132, 137, 120 LRRM 3562 (2d Cir. 1985), cert. denied, 479 U.S. 814, 107 S.Ct. 67, 93, L.Ed.2d 25 123 LRRM 2591 (1986) (quoting <u>NLRB v. Deena Artware, Inc.</u>, 361 U.S. 398, 402, 80 S.Ct. 441, 4 L.Ed.2d 400 45 LRRM 2697 (1960). In other words, two companies are a single employer "if there is an 'absence of an arm's length relationship found among unintegrated companies.' " <u>LaBarbera v. C. Volante Corp.</u>, 164 F.Supp.2d 321, 325 (E.D.N.Y. 2001) (quoting <u>Lihli Fashions Corp.</u>, 80 F.3d at 747-48).

147.   The Supreme Court has set forth a four-factor test to determine whether two companies are a single employer. Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 58 LRRM 2545 (1965). The test specifically looks at the companies' interrelation of operations, common management, centralized control of labor relations and common ownership. Id. In addition to these four factors, the presence of common office facilities and equipment, as well as the existence of familial connections among the businesses, may also be considered when determining single employer status. See LaBarbera v. C. Volante Corp., 164 F.Supp.2d at 325 (citing Radio & Television Broadcast Technicians, 380 U.S. 255 58 LRRM 2545). In order to make a determination of single-employer status, it is not necessary for all of the aforementioned factors to be present, and no one factor is more important than another. Lihli Fashions Corp., 80 F.3d at 747. Key to determining single employer status is the finding that the companies at issue do not conduct business dealings at arm's length, as they would if they were not closely related to each other. Id. 2

148.   In this case, MMK and Road Savers do not meet the requirements of the single employer test. Although both companies were in existence at the same time, the incorporation documents filed for each company prove that they have different ownership. Moreover, there is no evidence to support the Funds' allegations that they are a single employer as MMK and Road Savers, as is set forth more fully above.  The Defendants do not have interrelated operations, common management, centralized control of labor relations and/or common ownership. The companies were not working on the same jobs and they did not simultaneously employ the same employees, as if they were actually one enterprise. Moreover, the Funds have admitted that MMK and Road Savers do not share common managers and/or supervisors and that no familial

relationships between the principals of MMK and Road Savers. Thus, there is no link between the two companies in terms of their management and/ or control of labor relations. Significantly, the companies' equipment yards are located in different towns.

### a. Appropriate Employee Bargaining Unit

149.   "The determination that separate companies are a 'single employer' is not enough to bind all the separate companies to the collective bargaining agreements of any one of the companies." Lihli Fashions Corp., Inc. v. NLRB, 80 F.3d 743, 747-48, 151 LRRM 2941 (2d Cir. 1996). As the Supreme Court held in South Prairie Construction Co. v. Local No. 627, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 92 LRRM 2507 (1976) (per curiam), when two entities are found to be a single employer, in order for the non-union company to be bound by a CBA made by another company it must be also demonstrated that together the companies represent an appropriate employee bargaining unit. Lihli Fashions Corp., 80 F.3d at 747-48 (citing South Prairie Construction Co., 425 U.S. 800 at 804-05.

150.   The purpose of this requirement is to protect the rights of the non-union employees to representatives of their choice, or not to have union representation at all, since binding the employer necessarily affects its employees' rights. LaBarbera v. C. Volante Corp., 164 F.Supp.2d 321, 326 (E.D.N.Y. 2001) (citing Local One Amalgamated Lithographers of America v. Stearns & Beale, Inc., 812 F.2d 763, 769-70 124 LRRM 2809 (2d Cir. 1987).

151.   In determining whether or not an appropriate bargaining unit exists, "attention 'shifts from the control, structure and ownership of the employer to the community of interests of the employees.' " LaBarbera v. C. Volante Corp., 164 F.Supp.2d 321, 326 (E.D.N.Y. 2001) (quoting Cuyahoga Wrecking Corp. v. Laborers Int'l Union of North America, Local Union #210, 644 F.Supp. 878, 882, 123 LRRM 3162 (W.D.N.Y. 1986). Eight factors are relevant in

41

making this determination: "geographic proximity, similarity of skills and functions, similarity of employment conditions, centralization of administration, managerial and supervisory control, employee interchange, functional integration of the employer, and bargaining history." C. Volante Corp., 164 F.Supp.2d at 326.

152.   Based on the factors set forth in C. Volante Corp., MMK and Road Savers do not represent an appropriate bargaining unit. As discussed supra, MMK has rarely employed employees who had previously been employed by Road Savers and such employees were never employed by both companies at the same time. Moreover, as is set forth more fully above, many drivers have a substantial number of companies which have employed them over a short period of time.  Most employees of MMK have never been employed by Road Savers. Although, the companies' have shared a common mailing address, MMK and Road Savers physical operations are in different towns  as the employees of MMK report to Ronkonkoma and the employees of Road Savers report to Holtsville. Moreover, the companies do not treat their employees the same as MMK's employees are covered by the CBA and Road Savers' employees are not.

153.   Moreover, it is stipulated that the companies do not have centralized administration, managerial and supervisory control over their employees, and that the companies' employees are not freely exchanged to a point where the employees are unaware of which company they are working for at what time. Under these facts, the Funds have not established that the employees of MMK and Road Savers share a "community of interest." See King v. Unique Rigging Corp., No. CV 01-3797, 2005 WL 2290585, at *3 (E.D.N.Y. Sept. 20, 2005), See Ziskin Dec., Exhibit "XX" (finding the existence of an appropriate bargaining unit where employees of the two companies were based at the same location, drove the same vehicles when performing work for either company, and were both supervised by the same person); C. Volante

Corp., 164 F.Supp.2d at 326 (finding the existence of an appropriate bargaining unit where the companies exchanged employees, the employees performed the same job for both companies, and the working conditions were the same at both companies).

154.   Based on the foregoing, MMK and Road Savers do not represent an appropriate bargaining unit, and are not single employers such that both companies can be held liable for the obligations pursuant to the CBA signed by MMK.

155.   Likewise, R. Rio Trucking does not represent an appropriate bargaining unit with Road Savers/Rio Paving. As discussed supra, R. Rio Trucking employed only one employee, Richard Rio. Moreover, the employees of Road Savers/ Rio Paving were never employed by R. Rio Trucking. Additionally,  the companies did not share a common mailing address, their physical operations were in different towns as R. Rio Trucking's truck was kept in Ridge, New York and the employees of Road Savers/Rio Paving report to Holtsville. Further, the companies did not share the same terms and conditions of employment as R. Rio Trucking's one employee was covered by the Local 282 CBA and Road Savers/Rio Paving's employees are not.

156.   Moreover, R. Rio Trucking and Road Savers/Rio Paving did not have centralized administration, managerial and supervisory control over their employees, and the companies' employees were not freely exchanged. The facts and circumstances set forth more fully herein clearly show that the Funds have not established that the employees of R. Rio Trucking and Road Savers/Rio Paving share a "community of interest." As such, R. Rio Trucking and Road Savers/Rio Paving do not represent an appropriate bargaining unit and as such, both companies cannot be held liable for the obligations pursuant to the CBA signed by R. Rio Trucking.

157.   Accordingly, the single employer doctrine is inapplicable to the facts of this case and the Funds' single employer claim must be dismissed.

3.  **The Double-Breasted Operation Claim**

158.   The Complaints in the consolidated cases allege breach of contract claims based upon the allegation that the Defendants established double-breasted operations. See Ziskin Dec., Exhibit "C", Complaint # 06-1329, 5th Cause of Action, ¶ 71-77; Ziskin Dec., Exhibit "A", Complaint # 03-1508, 10th Cause of Action, ¶ 116-124. Significantly, the Funds do not assert a claim under Section 301 of the LMRA.

159.   A double-breasted operation is one in which "one subcontractor operates a union company that bids on union contracts and a nonunion company that bids on nonunion contracts." Local One, Amalgamated Lithographers v. Stearns & Beale, Inc., 812 F.2d 763, 770 124 LRRM 2809 (2d Cir. 1987); See also Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc., 690 F.2d 489, 497 n.1, 111 LRRM 2787; 112 LRRM 2525 (5th Cir. 1982). The formation of a double-breasted operation is not a per se violation of ERISA or the LMRA, see King v. Galluzzo Equip. & Excavating, Inc., No. 00 CV 6247, 2001 WL 1402996, at *12 (E.D.N.Y. Nov. 8, 2001), but may serve as the basis for an allegation that the operation is in fact a single employer or alter ego employer. Here, the Funds allege a breach of contract action based on defendants' purported formation of a double-breasted operation.

160.   However, "common-law contract claims relating to employee benefits are generally preempted by ERISA." Flanagan v. IDI Construction Co., Inc., 392 F.Supp.2d 485, 488-89 (E.D.N.Y. 2005) (citing Devlin v. Transp. Communs. Int'l Union, 173 F.3d 94, 101, 84 FEP Cases 18 (2d Cir. 1999). Likewise, Section 301 of the LMRA preempts most causes of action alleging breach of contract between a union and employer. Williams v. Comcast Cablevision of New Haven, Inc., 322 F.Supp.2d 177, 181-82, 175 LRRM 2289 (D. Conn. 2004) (citing Allis-Chalmers Corp. v. Lucek, 471 U.S. 202, 210-11, 105 S.Ct. 1904, 85 L.Ed.2d 206

118 LRRM 3345 (1985) ("questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort"). While not every dispute that concerns a CBA is preempted by Section 301, claims that are "founded directly on the rights created by collective-bargaining agreements," that assert rights "derived from the contract," or that are "inextricably intertwined with consideration of the terms of the labor contract" are preempted by Section 301. Williams, 322 F.Supp.2d at 182 (citing Caterpillar. Inc. v. Williams, 482 U. S. 386, 390, 107 S.Ct. 2425, 96 L.Ed.2d 318 125 LRRM 2521 (1987); Allis-Chalmers Corp. v. Lucek, 471 U.S. 202, 213, 105 S.Ct. 1904, 85 L.Ed.2d 206 118 LRRM 3345 (1985)).

161.   In the instant matter, Plaintiffs' breach of contract claims are based on provisions contained within Section 35 of the CBA, which prohibit the signatory employer from contracting or subcontracting with companies that are not signatories to a union agreement. Ziskin Dec., Exhibit "QQ". The claims, which are based on breach of the express terms of the agreement and are founded exclusively upon the rights and duties specified in the Agreement, fall with the scope of Section 301 preemption. Williams, 322 F.Supp.2d at 182 (holding that plaintiff's breach of contract claims were preempted by Section 301 where they were clearly based on explicit provisions of a CBA). As the Funds have failed to set forth a claim under LMRA Section 301, the Funds' breach of contract claim must be dismissed. Greenblatt v. Delta Plumbing & Heating Corp., 68 F.3d 561, 572, 150 LRRM 2518 (2d Cir. 1995) (stating that a common law claim must either be treated as a Section 301 claim or dismissed as pre-empted by federal labor-contract law).

**4.  Successor Liability**

162.   There is no precise formula prescribing the level of continuity sufficient to impose successor liability. Instead, this determination, "which is primarily factual in nature and is based upon the totality of the circumstances of a given situation, requires that the [court] focus on whether the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43 (1987) (quoting Golden State Bottling Co. v. NLRB, 414 U.S. 168, 184 (1973).

163.   In making this determination, courts look to a number of factors such as whether the new employer continued to employ a majority of the predecessor's workforce; whether the new employer continued to utilize the predecessor's machinery, plant and equipment; whether the new employer continued to produce the same line of product and to use the same method of production as the predecessor; and whether the new employer completed work orders secured by the predecessor. See id.; Proxy Communications of Manhattan, Inc. v. N.L.R.B., 873 F.2d 552, 554 (2d Cir. 1989) (per curiam); Upholsterers' Intern. Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1329 (7th Cir. 1990); Systems Management, Inc. v. N.L.R.B., 901 F.2d 297, 303-04 (3d Cir. 1990); Trustees for Alaska Laborers v. Ferrell, 812 F.2d 512, 515 (9th Cir. 1987); Newspaper and Mail Deliverers' Union of New York and Vicinity v. United Magazine Co., 809 F. Supp. 185, 192 (E.D.N.Y. 1992) In performing this analysis, an important consideration for the Court is whether the retained employees will "view their job situations as essentially unaltered." Golden State, 414 U.S. at 184.

164.   In the instant matter, a two year gap existed between the expiration of R. Rio Trucking's CBA on June 30, 1999 and the CBA signed by MMK on March 15, 2001. Even more significantly, MMK did not continue the operations of R. Rio Trucking.  In fact, the last report of

employment activity at R. Rio Trucking was in 1998 when Richard Rio ceased operations and gained other employment. Thus, MMK did not continue any of R. Rio Trucking's operations. Moreover, there have been no allegations that MMK purchased assets from R. Rio Trucking or that the companies operated out of the same location. In sum, MMK cannot be viewed as a continuation of R. Rio Trucking so that it could be held accountable for any obligations of R. Rio Trucking.

165.   Accordingly, the Funds' successor liability claim must be dismissed.

**5.**   **Adoption of Contract Claim**

166.   Regarding the Funds' adoption of contract claim against R. Rio Trucking for the time period after the CBA expired on June 30, 1999, the District Court does not have subject matter jurisdiction pursuant to ERISA and Plaintiffs have failed to state a claim under the Labor Management Relations Act. Although the Second Circuit in Brown v. C. Volante Corp., 194 F.3d 351 (2d Cir. 1999), held that a party's conduct may manifest an intent to adopt, or agree to, the unsigned CBA, the Funds' Complaint does not allege that R. Rio Trucking adopted the 1999-2002 CBA. Significantly, the Complaint only alleges violations of ERISA, and does not contain any allegations of LMRA violations.

167.   Additionally, the Plaintiffs did not plead in either of the two respective Complaints in these cases that either Rio Paving and/or Road Savers adopted the terms and conditions of any unintroduced R. Rio Trucking CBA to provide a basis for an adoption by course of conduct theory.

168.   Notwithstanding the LMRA issue, the material facts, as set forth more fully herein, clearly set forth that R. Rio Trucking did not intend to be bound to the 1999-2002 CBA. For contributions arising when an agreement was not in effect, the Plaintiffs have failed to state a

cause of action under the LMRA by not pleading it in the Complaint.

### 6.  No Liability May Be Assessed Against A Trade Name.

169.    At paragraph 8 of the Complaint (ECF # 1; 03-cv-1508), Plaintiffs allege that "Defendant R. Rio Trucking a/k/a R. Rio Trucking, Inc. ("R. Rio") is a New York company that maintains its principal place of business at 15 Elizabeth Way, Ridge, New York 11961, and has employed at least one employee covered by a collective bargaining agreement with Local 282."

170.    At paragraph 9 of the Complaint (ECF # 1; 03-cv-1508), Plaintiffs allege that "Upon information and belief, Richard Rio is the owner of R. Rio."

171.    At paragraph 10 of the Complaint (ECF # 1; 03-cv-1508), Plaintiffs allege that "At all times material hereto, R. Rio was engaged in the business of hauling paving materials to and from construction sites, suppliers and other entities."

172.    First, there is no indication that Richard Rio was intended to be sued in his individual capacity.

173.    Richard Rio was never named personally or alleged to have been "doing business as R. Rio Trucking."

174.    Instead, the complaint alleged in the caption and the text that "R. Rio Trucking a/k/a R. Rio Trucking, Inc." was the defendant.

175.    At paragraph 8 of the complaint it alleged that R. Rio Trucking a/k/a R. Rio Trucking. Inc. was a "company", and at paragraph 9 it alleged that, "On information and belief, Richard Rio is the owner of Rio."

176.    Indeed, there is an R. Rio Trucking, Inc., a corporation.

177.    There can be no finding of liability against Richard Rio personally, as he had no reason to defend against the suit personally, he was not served in his personal capacity, and

plaintiff sued an entity called "R. Rio Trucking" at its own risk.

178.   For the same reason, there maybe no liability assessed against R. Rio Trucking, Inc., as the corporation was not served through the Secretary of State and/or its address registered with the New York State Department of State Division of Corporations.

179.   Any liability assessed against "R. Rio Trucking" is on its face against a trade name and is not enforceable against Richard Rio personally and/or R. Rio Trucking, Inc.

180.   In <u>Marder v. Betty's Beauty Shoppe</u>, 38 Misc. 2d 687, 239 N.Y.S. 2d 923 (Appellate Term, Second Dept., 1962) the court held: "The judgment against the trade name herein is a nullity because there is no provision of law which permits the commencement of an action against a business operating under a trade name but rather permits the commencement of an action against an individual doing business under a trade name."

181.   <u>As in Marder</u>, supra, this action was not brought against Richard Rio and/or R. Rio Trucking, Inc. doing business under a trade name, but only against a trade name.

182.   Therefore, neither Richard Rio nor R. Rio Trucking, Inc. can be held personally liable. *See also*, <u>Garden City Boxing Club, Inc. v. Guerra</u>, 2006 U.S. Dist. LEXIS 95463 [*7~*8] and cases cited therein, including <u>Marder, supra</u> (E.D.N.Y., 2006 - Magistrate's Report and Recommendation- "Because Cevicheria Los Guerra Restaurant is nothing more than a trade name, it has no independent legal existence and lacks the capacity to be sued under New York law");.<u>M.E. Aslett Corp. v. Crossfield Electronics, Inc.</u>, 1987 U.S. Dist. LEXIS 1088 [*2] (E.D.N.Y., 1987 - "The party named as defendant in this action, therefore, is nothing but a trade name which has no independent legal existence and which lacks the capacity to be sued under New York law"); <u>Little Shoppe Around the Corner v. Carl</u>, 80 Misc. 2d 717, 719, citing <u>Marder v. Betty's Beauty Shoppe, supra</u> (Sup. Ct., Rockland Cty., 1975 - "No action may be brought by,

nor may any suit be maintained against, a trade name as an entity... .Any such proceeding is a nullity"); Provosty v. Lydia E. Hall Hospital, 91 A.D. 2d 658, 659, citing Little Shoppe, supra, (Second Dept., 1982 - "a trade name, as such, has no separate jural existence, and that it can neither sue nor be sued independently of its owner, who in this case was concededly never served").

183.    Because R. Rio Trucking is not a legal entity and cannot be sued, there can be no liability against Richard Rio and/or R. Rio Trucking, Inc.

184.    It follows then that Rio Paving and/or Road Savers may not be assessed joint and several liabilities with R. Rio Trucking under the theories of single employer, alter ego and/or double breasting since R. Rio Trucking is not a legal entity and cannot be sued.

**The Plaintiffs have failed to submit the operative collective bargaining agreements that they rely upon to assert liability.**

185.    At the conclusion of trial, the Defendants moved to dismiss Action #1 upon the grounds that the Plaintiffs failed to introduce into evidence the underlying collective bargain that they assert provides for a basis of liability, while reserving for this post trial submission their application for a dismissal if Action #2 upon the same grounds.

186.    As was demonstrated to the Court in the cross-examination of Richard Bamberg, one of the auditors for the Plaintiffs, his audit results were completely erroneous because they differed from the contents of the respective MOAs submitted into evidence.  As also submitted herein, a review of Ken Jones' audits are equally flawed because his audit results were also different from the MOAs  introduced into evidence by the Plaintiffs.

187.   Rule 1002 of the Federal Rules of Evidence provides:

> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided by these rules or by Act of Congress.

188.   Here, the Plaintiffs have not provided a written copy of the CBA in effect between either R. Rio Trucking or MMK, and have cited to any exception to Rule 1002 that would allow the Court to consider the MOA to determine the contents of the applicable CBA.  See:  Ruddick v, Regal Health & Rehab Center, Inc., 2009 WestLaw 3417474 (N.D. Ill 2009) (absent the introduction of the applicable collective bargaining agreement, the Plaintiffs failed to show what the terms of the applicable collective bargaining agreement were); Dugan v. R.J. Corman Railroad Company, 344 F.3d 662 (7th Cir. 2003)(Trustees could not enter into evidence portions of a Trust Agreement without the entire agreement being introduced).

189.   Both of the respective complaints in Action #1 and in Action #2 allege that the applicable Defendant entered into a collective bargaining agreement with Local 282. See Defendants' Exhibits "A" and "C".  Yet the Plaintiffs have failed to produce and enter into evidence any such collective bargaining agreement, and have also failed to allege any course of conduct in either Complaint that would allow the Court to consider any adoption theory. Additionally, even if they could have done so, they failed to move to amend the respective Complaints to conform to the trial evidence to the proof in accordance with FRCP  15(B).

190.   As a result, the Plaintiffs have not provided the Court with any evidence prohibiting any alleged conduct by the Defendants to support their respective theories of liability, since none of the introduced MOAs provide any such prohibitions to establish any liability.

**Significant case law in this District.**

191.   In a Memorandum and Order decision of the Honorable Leonard D. Wexler in the matter of  Frank H. Finkel, et al. against S.I. Associates Co., Inc. and Nassau Ready Mix Corp., 05-CV-4656, a factual scenario similar to the one set forth herein was also presented to the Court to determine if the same legal theories as presented herein could be used to hold the named

defendants liable.

192.   In the S.I. Associates case, both companies were owned by family members; both family members owned real property from which the Defendants operated their respective businesses; S. I. Associates was signatory to  Local 282 CBA while Nassau Ready Mix Corp. was not; Nassau Ready Mix acquired trucks and equipment previously owned by S.I. Associates; and employees of S.I. Associates subsequently worked for Nassau Ready Mix.

193.   The Court held that the defendants did not have interrelated operations, common management, centralized control of labor functions or common ownership. The businesses of the defendants were different, with S. I. Associates engaged in the business of hauling excavation materials, while Nassau Ready Mix was engaged in the business of the manufacture and transportation of concrete products.

194.   Judge Wexler also determined that the respective corporate identities were separate, and that the respective employees of the two companies were separately hired and paid. Judge Wexler additionally ruled that the alter ego theory did not apply because the Plaintiffs' failed to prove that either operation was a sham operation and the sale of trucks and equipment from one defendant to the other was for valuable consideration.

195.   In this Court's Memorandum and Order in the case of Theodore King, et al. against Audax Construction Corp., et al., 02-CV-582, the Plaintiffs also alleged in their underlying complaint against the Defendants, the theories of single/joint employer; double breasting operations; and an alter ego enterprise.  In finding in favor of the Plaintiffs against the Defendant Audax, this Court determined liability against Audax for its failure to comply with the Local 282 CBA's obligation for a signatory employer to report outside nonunion truck hires, and payment of wages and benefits equal to those paid to a Local 282 member to outside nonunion drivers

when employed by a signatory employer.

196.   In the present factual scenario, it is submitted that the Plaintiffs have also only demonstrated that MMK, when hiring trucks with a driver from Road Savers, failed to similarly comply with the Local 282 CBA reporting Requirements, and have failed to establish any other theory of liability.

## C.   CONCLUSION

197.   For the foregoing reasons, it is concluded that the Plaintiffs Complaint against the Defendants alleging the theories of single/joint employer; double breasting operations and an alter ego enterprise are dismissed.

Dated: September 12, 2011
Commack, New York          The Ziskin Law Firm, LLP


_____/S/_____
By:   RICHARD B. ZISKIN
      Attorneys for Defendant
      MMK Trucking, Inc. in Actions #1 & 2
      6268 Jericho Turnpike, Suite 12A
      Commack, NY 11725
      631-462-1417


      Dandeneau & Lott


_____/S/_____
By:   GERALD V. DANDENEAU
      Attorneys for Defendants
      Rio Paving and Road Savers, Inc. in Action #1
      Road Savers, Inc. in Action #2.
      425 Broad Hollow Road, Suite 418
      Melville, New York 11747
      631-454-0606


_____/S/_____
      LAWRENCE MICHAEL MONAT, ESQ.
      Attorney for R. Rio Trucking
      150 Motor Parkway, Suite 401
      Hauppauge, New York 11788
      631-234-4411